# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## HALL v. COMMONWEALTH.

89 171
90 332
90 676

### June 23d, 1893.

1. HOMICIDE—*Fixing day of trial—Acts 1889–'90, p. 79.*—This statute, requiring the court to fix the day of trial of a criminal case ten days before commencement of the term, is merely directory, and the omission to comply with it—

HELD:

   No ground to set aside a verdict of guilty.

2. JURORS—*Competency—Case at bar.*—In a trial for murder, a juror on *voir dire* said that newspaper accounts had made an impression on his mind, but that "it would yield to evidence," and that he could give prisoner a fair and impartial trial. A second said the same, and that he would not be willing to act on those accounts, but that it would take evidence to remove the impression. A third said he had not formed "a decided opinion," but an impression that "would be right hard to get over, but that it would not require sworn statements to remove it."

HELD:

   These jurors were competent.

3. DYING DECLARATIONS—*Case at bar.*—Shortly after being shot deceased said to his wife: "It is a death shot this time," and that he wanted to go to heaven when he died; but did not express belief he was going to die. To others he told who shot him and the circumstances, but did not say anything about dying. He died twenty-four hours after being shot.

HELD:

   His declarations were admissible as evidence.

4. INSTRUCTIONS, unsupported by any evidence, should be refused.

5. IDEM—*Case at bar.*—Instructions having been given to the jury that they could not find prisoner guilty of murder in the first degree, unless the evidence showed him guilty "to the exclusion of all reasonable doubt," and the jury having found him guilty of murder in first degree—

HELD:

> The prisoner could not have been prejudiced by the refusal of the
> court to instruct the jury that " the evidence of his guilt must
> be so strong as to exclude every reasonable hypothesis of ihs
> innocence"; and that " mere suspicion, however strong, is not
> sufficient; the law requires proof to the exclusion of every rea-
> sonable doubt."

6. VERDICT—*Signing.*—Where the record shows that the verdict of mur-
der was delivered in open court, it is immaterial that it does not also
show that the verdict was signed.

Error to refusal of the judge of the circuit court of Wise
county, on 29th February, 1892, to allow a writ of error and
*supersedeas* to the judgment of the county court of said
county, rendered February 4th, 1891, whereby Talt Hall, the
plaintiff in error, was, in accordance with the verdict of the
jury at the trial of the indictment against him for the murder
of one Enos B. Hylton, sentenced to be hanged by the neck
until dead. Opinion states the case.

*Richmond & Richmond,* for plaintiff in error.

*Attorney-General R. Taylor Scott,* for commonwealth..

LEWIS, P., delivered the opinion of the court.

The prisoner was indicted in the county court of Wise
county, and at a subsequent term was tried and sentenced to
be hanged for the murder of Enos B. Hylton. In the progress
of the trial numerous exceptions were taken to rulings of the
court, which will be considered in the order in which they are
presented.

1. It appears that when the case was called for trial, at the
term at which it was tried, the prisoner objected to proceed-
ing, and moved for a continuance, on the ground that the case
had not been set for trial for any certain day of the term. It

is contended that this objection is supported by the act of assembly, approved February 24, 1890, which makes it the duty of the judge of each county and corporation court, at least ten days before the commencement of every term, to set for trial, on a certain day of the term, each criminal case then pending ; and provides that the clerk shall arrange the docket and issue *subpœnas* for the witnesses accordingly. Acts 1889–'90, p. 79. But we do not think this the true construction of that act. Its evident purpose was to expedite the dispatch of criminal business in the county and corporation courts, and to prevent the unnecessary attendance upon those courts of witnesses, whose attendance usually occasions inconvenience to themselves and expense to the state. At all events, the statute is directory merely, it being no otherwise intended for the benefit of the accused than as a means of insuring a speedy trial. The case, in this particular, is ruled by what was decided in *Wash's Case*, 16 Gratt. 530, in construing the statute relative to the time for the issuing of the *venire facias* preparatory to the trial of felony cases.

2. The prisoner next moved to quash the writs of *venire facias* in the case ; which motion also was overruled. No grounds for the motion, however, are set forth in the record, and the proceeding in this particular appears to have been regular and unexceptionable.

3. Upon the impanelling of the jury the prisoner excepted to B. O. Ferguson, I. N. Kelley, and A. W. Irvine as jurors, on the ground that they had formed an opinion as to the prisoner's guilt, which rendered them incompetent to serve as jurors in the case.

The first juror, Ferguson, stated, on his *voir dire*, that he had read accounts of the tragedy in the newspapers, which had made an impression on his mind, but that " it would yield to evidence " ; and further stated : " I have an impression that the prisoner killed the deceased, but as to his guilt or

innocence I have no impression.   I can give him a fair and impartial trial."

Kelley also stated on his *voir dire* that an impression had been made on his mind by reading the newspapers, but that it would yield to the evidence, and that he could give the prisoner a fair and impartial trial.   " The partial opinion that I have formed," he further said, " will have no influence with me in the trial of this case.   I have no prejudice for or against the prisoner.   I would not be willing to act on what I have read.   I think I can dismiss any impression I have, but it will take evidence to do it."

Irvine stated that he had *not made up any decided opinion*, but that he had an opinion that would require some kind of statements or evidence to remove; that the impression made upon his mind would be a right hard thing to get over, but that it would yield to evidence of the same nature as that which had made it.   " It will not require sworn statements," he added, " to remove my impressions."

As to the first two veniremen it is clear that they were competent jurors, and were properly accepted as such.   And we think Irvine was also.   If his statement that the impression on his mind would be " a right hard thing to get over," stood alone, the objection to his competency, perhaps, would be insuperable.   But the remark is explained both by what precedes and what follows it, which shows that the juror had not formed any fixed or decided opinion as to the guilt or innocence of the prisoner, and that such impression as had been made upon him would not only yield to evidence, but that it would not even require " sworn statements " to remove it.

The settled rule is that if, upon the whole examination, it appears that the opinion is *decided* or *substantial*, the juror is incompetent.   On the other hand, if the opinion is merely hypothetical, or so slight that it will, in all probability, yield

to the evidence, especially if he says he believes he can give the prisoner a fair trial, he is competent; and the court must determine upon the particular circumstances of each case, whether the opinion be decided or substantial, or hypothetical merely. *Epes' Case,* 5 Gratt. 676; *Clore's Case,* 8 Id. 606; *Wormley's Case,* 10 Id. 658: *Jackson's Case,* 23 Id. 919; *Washington's Case,* 86 Va. 405; Math. Crim. Dig. (3d ed), 275, *et seq.*

In *Staup* v. *Commonwealth,* 74 Pa. St. 458, the court say: " Where the opinions or impressions of the juror are founded on rumor and reports, or even newspaper statements, which he feels conscious he can dismiss; where he has no fixed belief or prejudice, and is able to say he can fairly try the prisoner on the evidence, freed from the influence of such opinions or impressions, he ought not to be excluded. If exclusion should follow from such unsettled convictions, it would often be difficult to obtain a jury."

4. The subject of the next exception is the action of the court in impanelling the jury. The bill of exceptions states that after a panel of sixteen persons, free from exception, had been obtained, and the prisoner had stricken therefrom the names of four of the panel, but before the jury were sworn, the attorney for the commonwealth suggested that the clerk had not informed the prisoner as to his right to challenge the whole array, or, for cause shown, to challenge any one or more of the veniremen, &c.; whereupon the court directed, against the objection of the prisoner, that all the veniremen be recalled, including the four whose names had been stricken from the panel by the prisoner, and, after this had been done, proceeded to impanel a jury *de novo* for the trial of the case, and then proceeded with the trial accordingly.

There was nothing in this action of the court of which the prisoner can justly complain.

5. The next question is as to the admissibility of certain de-

clarations of the deceased made after the shooting. The deceased was wounded in the breast with a pistol, shortly before 2 o'clock P. M., on the 25th of July, 1891, and died from the effects of the shot about 2 o'clock the next morning. A witness for the commonwealth, the wife of the deceased, testified that she reached the deceased soon after the shooting, and that he then remarked to her : " Helen, it is a death shot this time." He also spoke of dying, and said he wanted to go to heaven when he died, though he did not say in so many words he believed he was going to die. He seemed to be suffering, she said, and looked like a man in the agonies of death.

The commonwealth thereupon called a witness, Dr. Dingus, who testified that he attended the deceased after the shooting, and remained with him until he died. He also testified that the deceased told him, in answer to his inquiry as to how he came to be shot, that he had a warrant of arrest for one Miles Bates, whom he arrested, when a man, who was with Bates, stepped up to him, and said, " Give up that prisoner and pistol, or I will shoot you," and shot him before he could do anything. The witness did not hear the deceased say anything about dying.

Another witness for the commonwealth—J. A. Hubbard—testified that he saw the deceased soon after 2 o'clock on the day of the shooting, and heard Charles Lawrence ask him who shot him, to whom he answered, " The man they call Talt Hall," and then went on to say that after he had arrested Bates, Hall (the prisoner) came up and told him to give up his pistol or he would shoot his brains out, and that, upon his refusing to do so, the prisoner pushed him back and shot him.

The prisoner objected to the introduction of these declarations as evidence, on the ground that a sufficient foundation for their introduction had not been laid; but the court admitted them, and he excepted.

We think they were properly admitted. The principle

upon which, in cases of homicide, the dying declarations of the deceased are admitted in evidence, is that they are declarations made in extremity, under a sense of impending death, and, therefore, when every motive to falsehood is silenced. It is not necessary, however, that they should be stated, at the time, to be so made. It is enough if it appears that they were made under that sanction ; and, when this is shown, the length of time between the declarations and the death of the declarant is an immaterial matter. 1 Greenl. Ev., sec. 158. Thus, in *Tinckler's Case*, 1 East. P. C. 354, they were made ten days before death ; in *Rex* v. *Mosley*, 1 Mood. Cr. Cas. 97, they were made eleven days before death ; and in *Swisher's Case*, 26 Gratt. 963, they were made ten days before death ; and in all these cases the declarations were received.

In the last-mentioned case it was said by Judge Christian, speaking for the court, and the authorities uniformly hold, that if the deceased, *at the time the declarations were made*, was under a sense of impending dissolution, and a consciousness of the awful occasion, the principle is not affected by the fact that death did not ensue until a considerable time thereafter, nor by the fact that on other occasions, when encouraged by others, he may have expressed some slight hope of recovery, unless such expressions, taken together with all the circumstances of the case, show that he had hope of recovery when the declarations were made.

Tried by this test, the declarations in question were admissible. They were made very soon after the deceased had stated to his wife that the wound was a mortal one, or, in his own language, that it was " a death shot," and when death seemed impending ; and although she testified that he afterwards somewhat revived, and that *she* then had hope of his recovery, yet there is nothing to show that he himself had any such hope from the moment he was shot until he died.

His statements, then, are clearly admissible as dying decla-

rations; and this being so, it is needless to consider whether they were also admissible on the other ground contended for by the attorney-general, namely, as being a part of the *res gestæ.*

6. After the evidence had been closed, the court, on the motion of the attorney for the commonwealth, gave the jury the following instructions—viz. :

"(1) The court instructs the jury that if they believe from the evidence, to the exclusion of all reasonable doubt, that the prisoner wilfully, deliberately, and premeditatedly shot and killed the deceased, Enos B. Hylton, in this county, then they should find him guilty of murder in the first degree.

"(2) The court further instructs the jury that a mortal wound, given with a deadly weapon, in the previous possession of the slayer, without any or upon very slight provocation, is *prima facie* wilful, deliberate, and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances.

"(3) The court further instructs the jury that to constitute a wilful, deliberate, and premeditated killing it is not necessary that an intention to kill should exist any particular length of time prior to the actual killing; it is only necessary that such intention should come into existence for the first time at the time of such killing, or any time previously.

"(4) The court further instructs the jury that, on a charge of murder, malice is presumed from the fact of killing, and when the killing is proved, and is unaccompanied with circumstances of palliation, the burden of disproving malice is thrown upon the accused."

These instructions are so obviously correct, and in literal conformity with numerous decisions of the old general court and of this court, that no other comment upon the prisoner's exception to the action of the trial court in giving them is necessary. *Hill's Case,* 2 Gratt. 594; *Honesty's Case,* 81 Va. 283.

7. The next question relates to the refusal of the court to instruct the jury, at the instance of the prisoner, that if they should believe from the evidence that the prisoner killed the deceased in a scuffle, they could not find him guilty of murder in the first degree, unless they should also believe from the evidence that he provoked or brought on the scuffle in order to have a pretext to take the life of the deceased, or to do him some great bodily harm.

With regard to this instruction, it is enough to say that it was not relevant to the evidence, and, if given, would have been calculated to mislead the jury.    The evidence did not even tend to show that the fatal shot was fired in a scuffle. The prisoner himself testified that he did not lay hands on the deceased at all; and none of the commonwealth's witnesses testified that they saw the parties in a scuffle before the shot was fired, though several testified they saw a scuffle after they heard the report of the pistol.

The prisoner also moved the court to instruct the jury that, before they could convict, the evidence of guilt must be so strong as to exclude every reasonable hypothesis of his innocence; and, further, that " mere suspicion, however strong, is not sufficient; the law requires proof to the exclusion of every reasonable doubt."

These instructions undoubtedly propound the law correctly, but we do not think the refusal to give them was error for which the judgment must be reversed.    As we have seen, the court had already instructed the jury, in unmistakable terms, that they could not find the prisoner guilty of murder in the first degree, unless they should believe from the evidence, *to the exclusion of all reasonable doubt*, that he killed the deceased wilfully, deliberately, and premeditatedly.    And with this instruction to guide them in their deliberations, they found a verdict of murder in the first degree.

Now, if they had found a verdict of murder in the second

degree, the refusal to give the instructions might be justly said to have operated to the prejudice of the prisoner, because, in that case, it could not be said that, if the instructions had been given, the jury might not have found him guilty of voluntary manslaughter, or some other offense less than murder. But as it is—that is, in the view the jury took of the evidence—the giving of the instructions would not have informed them any more correctly or clearly than they had already been told what their duty was, or what the law required, in respect to finding a verdict of murder in the first degree. Hence, it would be unreasonable to suppose that, if the instructions had been given, the result might have been different.

In this respect the case is analogous in principle to *Mitchell's Case*, 75 Va. 856. In that case the clerk charged the jury that the punishment for the felony charged in the indictment was confinement in the penitentiary not less than *three* nor more than five years, whereas the minimum punishment was, in fact, not less than *one* year. The jury fixed the term of imprisonment at five years, and there was judgment accordingly. This court admitted that the clerk's charge to the jury in a felony case is equivalent to an instruction of the court, but, nevertheless, affirmed the judgment, on the ground that though the charge was erroneous, yet, as the jury had fixed upon the *maximum* term of imprisonment, and as that period had been correctly stated by the clerk in his charge, the prisoner had not been prejudiced. "It is plain," said the court, "that if the clerk had correctly stated the minimum as well as the maximum period, the verdict would have been precisely the same."

8. Another ground of error is that it does not appear by the record that the verdict was signed. This, however, is an immaterial matter, since the record shows that the verdict was delivered in open court and recorded, and that is sufficient. *Bird Woods' Case*, 86 Va. 933.

Opinion.

9. The next exception is to the action of the court in over-ruling the prisoner's motion for a new trial on the ground that the verdict was contrary to the law and the evidence. The bill of exceptions sets out the evidence (and not the facts proven), so that the case stands in this court as on a demurrer to evidence. And, viewing the case in this light, and giving to the verdict the weight to which it is entitled under the repeated and familiar decisions of this court, it is clear that the finding of the jury ought not to be disturbed.

It appears, in short, that the deceased was a policeman or special constable, and that on the day of the shooting he had a warrant for the arrest of one Miles Bates for larceny; that Bates, when he was apprehended by the deceased, was walking on the railroad, accompanied by the prisoner; that when the arrest was made the prisoner interfered and ordered the deceased to give up his prisoner, and immediately shot him upon his refusal to do so, inflicting a mortal wound from which death resulted in a few hours. There was an attempt to show that the prisoner acted in self-defense, or that the killing was done in a mutual combat, and without delibera-tion; but the attempt failed, and the verdict complained of was rendered.

It would serve no useful purpose to review the evidence. It is enough to say we have examined it carefully, and are fully satisfied that it warrants the finding of the jury. The crime appears to have been willfully and deliberately committed, and without extenuating circumstances. It was clearly a case of murder in the first degree, and the prisoner must suffer the penalty which the law prescribes.

RICHARDSON, J., *dissented.*

JUDGMENT AFFIRMED.