## HOYT v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. May 11, 1921.)

No. 186.

1. **Poisons ☞4—Defrauding government of revenue not necessary to conviction for illegal sales under Narcotic Act.**

   To sustain a conviction under Harrison Narcotic Act, § 2 (Comp. St. § 6287g), proof that the government was defrauded of revenue is not necessary.

2. **Poisons ☞9—Good faith of physician in dispensing drugs question for jury.**

   In a prosecution of a physician for dispensing drugs in violation of Harrison Narcotic Act, § 2 (Comp. St. §§ 6287g), which defendant, rather than the jury, may be entitled to determine what was proper treatment of a patient, whether he made such determination in good faith is a question for the jury.

3. **Poisons ☞9—Conviction for illegal sale of narcotics sustained by evidence.**

   Evidence which warranted a finding that defendant, while registered as a physician, was in fact engaged in the sale of drugs to addicts, and not in the practice of his profession, *held* to sustain a conviction for violation of Harrison Narcotic Act, § 2 (Comp. St. § 6287g).

4. **Jury ☞131(8)—Refusal to permit examination of jurors as to opinions held not error.**

   In the prosecution of a physician for illegal dispensing of narcotic drugs, refusal to allow counsel for defendant to ask jurors whether they had any preconceived ideas as to the proper method of treating drug addicts *held* not error.

5. **Criminal law ☞1166½(6)—Acceptance of incompetent juror not reversible error, where peremptory challenges are unused.**

   The acceptance of an incompetent juror is not reversible error, where defendant did not use all his peremptory challenges.

6. **Poisons ☞9—Evidence admissible on trial for illegal sale of narcotics.**

   On the trial of a physician, charged with illegal sale of narcotics, evidence of the quantities of such drugs purchased by him *held* admissible on the issue as to whether defendant was using the drugs in the practice

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of his profession in good faith, or whether he was engaged in handling them as merchandise.

**7. Poisons ⊂═⊃4—That persons to whom narcotics were sold were registered as addicts under state law no defense to prosecution under federal statute.**
In the prosecution of a physician for sale of narcotics in violation of Harrison Narcotic Act, § 2 (Comp. St. § 6287g), exclusion of evidence to show that the persons to whom defendant sold drugs were registered as addicts under the New York state law *held* not error.

In Error to the District Court of the United States for the Southern District of New York.

Criminal prosecution by the United States against Daniel J. Hoyt. Judgment of conviction, and defendant brings error. Affirmed.

See, also, 255 Fed. 927.

Campbell, Flaherty, Turner & Strouse, of New York City (Thomas G. Flaherty, of New York City, of counsel), for plaintiff in error.

Francis G. Caffey, U. S. Atty., of New York City (Peter B. Olney, Jr., Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. The defendant was tried upon four indictments, two of which were filed on October 3, 1917, one was filed on October 15, 1919, and the fourth on March 1, 1920. On March 10, 1920, all four indictments were by order of the court consolidated. The trial began on May 3, 1920, and was concluded on May 13. In the course of the trial counts 5, 8, 9, 10, 11, 12, 13, and 14 were dismissed. The indictments charged a violation of the Act of December 17, 1914, as amended by the Act of February 24, 1919. The act is what is known as the Harrison Narcotic Drug Act (Comp. St. §§ 6287g–6287q). The defendant was convicted on each of 13 separate counts, and was sentenced to four years' imprisonment in the United States Penitentiary at Atlanta, the sentences to run concurrently on each of the counts upon which he was convicted.

This court again takes occasion to express its decided disapproval of allowing a long delay to intervene between the finding of indictments and the time of trial. There cannot be efficient administration of criminal law, if long delays occur between indictments and trials. We feel that this cannot be too strongly expressed. Those of us who have any part in administering criminal law are under the most serious obligation to prevent unnecessary delays in the prompt trial of all accused persons. This is due alike to society and to persons accused. The long delays which have occurred in this case are to be justified only by very extraordinary circumstances, which, if they exist, are not disclosed by anything which appears in the record, nor by any satisfactory statement at the argument. It was said that delay was occasioned by doubt concerning the constitutionality of the act, and a decision of the Supreme Court was expected and awaited. But the first indictment, as previously stated, was found in October, 1917, and

the case in which the Supreme Court passed upon the constitutionality of the law had not at that time, and not until long after, and in January, 1919, been submitted to that court. United States v. Doremus, 249 U. S. 86, 39 Sup. Ct. 214, 63 L. Ed. 493. Then it was decided as early as March 3, 1919; but even that decision does not appear to have expedited the trial, as a whole year elapsed thereafter before the case was called for trial.

It should also be added that, if doubt existed as to the validity of the statute upon which the indictment was based, that was in our opinion not a reason for delaying the trial, but for hastening it to a conclusion, as no man should be allowed long to remain under the cloud of a possibly invalid indictment while courts exist in which the question can be determined. It is written into the Constitution (article 6) that "in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial," and it is the duty of the sworn officers of the law to govern themselves accordingly. A dilatory administration. of the criminal law not alone violates the rights of accused persons, but is also discreditable to the country and prejudicial to the protection of life and property.[1]

[1] Since the filing of this opinion the United States attorney for the Southern district of New York has submitted to the court an extended statement of the history of the case and an explanation of how it happened that trial was so long delayed. The concluding portions of his statement are so important that it is due to him, although he has not requested it, and also due to the efficient administration of justice in the Southern district of New York, that they be stated in connection with the criticism which we have passed upon the delay which occurred in this case. The concluding portions of his statement follow:

"In the fiscal years 1917 to 1920, inclusive, and the 11 months of the present fiscal year between July 1, 1920, and May 31, 1921, the government cases in the District Court for the Southern District of New York and their disposition were as follows:

|  | 1917 | 1918 | 1919 | 1920 | 11 Mos. (1921) |
|---|---|---|---|---|---|
| New civil suits | 186 | 233 | 515 | 1,204 | 1,898 |
| Civil suits terminated | 229 | 279 | 350 | 340 | 443 |
| New criminal prosecutions | 378 | 2,070 | 8,647 | 2,216 | 2,602 |
| Criminal cases terminated | 442 | 1,789 | 1,006 | 1,879 | 2,688 |

"It is impossible to correct the congestion on the court dockets until more [District] Judges are available. It would require three judges, sitting continuously, to dispose of the government's criminal cases. There are now untried enough pending prosecutions under the mail fraud statute alone to occupy the full time of one judge for a year.

"Moreover, since I assumed my duties in June, 1917, there has been an enormous increase in the importance of the government's civil litigation in this district. While I am unable at the moment to state the sum involved in 1917, the civil cases (exclusive of admiralty) which have been pending and are still pending this year involve nearly $70,000,000. In 1917 only a fraction of the time of one assistant was required for all the admiralty work in this district. To-day, there are on the dockets of the District Court here about 1,200 government admiralty cases, involving about $40,000,000.

"The liquor business handled is another illustration. During the current fiscal year upwards of 4,500 persons have been brought to this office charged with criminal violation of the Volstead Act. By March 31st, 1,724 of these had been released after investigation and prosecutions had been instituted against 2,628 (combined into 1,749 cases). In addition, during the present fiscal year, 734 injunction suits have been commenced under the nuisance

The material portions of section 2 of the Harrison Act are as follows:

"That it shall be unlawful for any person to sell, barter, exchange, or give away any of the aforesaid drugs except in pursuance of a written order of the person to whom such article is sold, bartered, exchanged, or given, on a form to be issued in blank for that purpose by the Commissioner of Internal Revenue. * * * Nothing contained in this section shall apply—(a) To dispensing or distribution of any of the aforesaid drugs to a patient by a physician, dentist, or veterinary surgeon registered under this act in the course of his professional practice only: Provided, that such physician, dentist, or veterinary surgeon shall keep a record of all such drugs dispensed or distributed, showing the amount dispensed or distributed, the date, and the name and address of the patient to whom such drugs are dispensed or distributed, except such as may be dispensed or distributed to a patient upon whom such physician, dentist or veterinary surgeon shall personally attend; and such record shall be kept for a period of two years from the date of dispensing or distributing such drugs, subject to inspection, as provided in this act." Comp. St. § 6287h.

The defendant was engaged in the practice of medicine in the city of New York and was registered with the collector of internal revenue of the United States as a dealer in and dispenser of opium and coca leaves and their salts, derivatives, and their compounds. He had made, according to his testimony, some special study of drug addiction, and maintained a small sanitarium for drug addicts, into which he received for treatment in the course of four years only 38 patients, although during the same period he dispensed narcotics to from 1,000 to 1,500 addicts. He admitted upon the stand that in February, 1920, persons to the number of 80 were coming to him for narcotics in a single day. The testimony was that the addicts paid him $1 for a day's supply of the drug and $3 for three days' supply. In his dealings with patients the payments were all cash transactions. The following is from his cross-examination:

"These addicts paid you $1, $2, $3, sometimes $4, sometimes $5, sometimes nothing; is that correct? A. Yes, sir."

In the year from February 1, 1919, to February 1, 1920, he dispensed 95,175 grains of heroin and 53,779 grains of morphine. A number of those who had been furnished with the drug by him testified at the trial. One addict began getting heroin from him in January, 1916, and continued receiving it to August 10, 1917, and from July 26, 1918, to February 3, 1920; during these periods it appeared that the defendant was furnishing the drug without any substantial reduction in

section of the Volstead Act (41 Stat. 305), 483 injunctions have been granted, 20 contempt proceedings for the violation of injunctions have been instituted, 6 contempt cases have been tried, numerous proceedings have been instituted for the destruction or other disposition of seized liquors (of which, as I am informed, there are stored in this district quantities of the value of upwards of $2,000,000), and numerous suits have been brought against government officials seeking the recovery of seized liquors. Congress appropriated nothing to the Department of Justice for the enforcement of the Volstead Act this year, and all the work under the liquor laws has been carried on by my regular force.

"These facts indicate the problem of this office in the endeavor to keep its work current."

amount and without any cure being effected. Another procured heroin from the defendant from June 20, 1916, to August 14, 1917, and again from June 26, 1918, to February 3, 1920, and in this case, also, there was no substantial reduction in the amount of the drug, and no cure was effected. The defendant admitted that an addict could not be taken off the drug by the sole method of the drug being given to him to administer to himself; that is, by what is known as the ambulatory method. He admitted that, to take him off the drug, it was essential that the addict should be put under absolute control. Nevertheless he was for long periods of time and for self-administration furnishing the drug to large numbers of persons over whom he had no control. There is abundant evidence in the record from which a jury might conclude that he was engaged in carrying on a mercantile business in selling narcotics, and was dispensing the drugs wholly outside of what under any theory of medicine could have been denominated professional practice only.

There are 29 assignments of error, but all except 4 were abandoned at the argument in this court. Those relied upon are as follows:

(1) That the evidence did not sustain the allegations of the indictments and did not show that the defendant had been guilty of any offense against the laws and statutes of the United States.

(2) The refusal of the court to permit defendant's counsel to ascertain whether or not any of the jurors had preconceived ideas as to the treatment of drug addicts.

(3) The refusal of the court to strike out testimony showing the quantities of narcotics purchased by the defendant after the court had dismissed the indictment charging the defendant with purchasing drugs for use not in the course of his practice.

(4) The refusal of the court to permit the defendant to bring out facts and the law in relation to the registration of addicts under the New York state law.

We shall consider them in the above order.

As respects the first of the errors assigned, if the evidence did not sustain the allegations of the indictment and did not show that defendant was guilty of any offense against the act, then the court was plainly in error in denying the motions to take the case from the jury. The motion for a dismissal of the indictment and for the direction of a verdict was upon the following grounds:

(1) That there was no proof that through the alleged misconduct of the defendant the government failed to collect all the taxes it was entitled to.

(2) That the defendant's method of treatment of drug addiction was in itself wrongfully made the main issue in the case; that the defendant, as a physician, was entitled under the law himself to judge as to what narcotics should be dispensed to patients, without a review of his decision by a jury.

(3) That the proof by the government's expert witness failed to disclose that there was any well-recognized method of successful treatment of drug addiction.

[1] It is true that there is no proof in the record that the government has failed to secure full revenue for all narcotics dispensed by defendant. But the defendant was not charged in the indictment with having defrauded the United States out of any revenue, and to sustain the conviction it is not necessary to show that the government has been

defrauded. It is true that the Harrison Act purports to be passed under the authority given to Congress under article 1, section 8, of the Constitution, which empowers it to lay and collect taxes, duties, imposts and excises. The raising of revenue is not, however, the sole purpose of the act. The statute has a moral as well as a revenue end in view. The revenue end is provided for in section 1 and the moral end in section 2. The fact that the motive which impelled Congress to enact section 1 differed from the motive which led it to adopt section 2 is immaterial, if it can be seen that the legislation enacted has some reasonable relation to the exercise of the taxing power given to Congress by the Constitution. That it has such a relation has been decided, and is not now open to question in this court. United States v. Doremus, 249 U. S. 86, 36 Sup. Ct. 214, 63 L. Ed. 493. To sustain a conviction for a violation of section 2, it is no more necessary to show a violation of section 1 than it would be necessary to show a violation of section 2 to sustain a conviction for a violation of section 1. It cannot be seriously contended that any other conclusion is possible.

[2] It may be true that a physician's method of treatment of drug addiction is a question to be determined by the physician himself, and not by a jury; but it can only be true so long as the physician is pursuing his method in his honest endeavor to effect a cure. If that is not his purpose, and he is dispensing the drug to keep the addict comfortable, he is violating the law, and whether he is doing the one thing or the other is a question the jury must decide. Webb v. United States, 249 U. S. 96, 39 Sup. Ct. 217, 63 L. Ed. 497.

[3] Then it is claimed that there is an absence of proof of what a physician might properly do in the course of his professional practice in treating drug addiction. There is no foundation upon which such a claim can rest. The evidence, if the jury believed it, justified the conclusion that the defendant was really engaged, and practically exclusively engaged, in the sale of drugs to addicts, and not in the practice of medicine for the cure of drug addiction. The statement as to the testimony already made clearly shows that, and it need not be enlarged upon in this connection. It is also asserted that the government failed to prove that there is any method for the successful treatment of addicts, and, if there is, in what it consists. We think the defendant's own testimony on the subject of a cure is sufficient, in itself and without more, to justify the verdict of the jury. The government, however, called to the stand as an expert witness a member of the staff of Bellevue Hospital in New York City, who had made a study of narcotic drug addiction, and who had treated thousands of such cases, and who testified fully on the subject. He testified that drug addiction cannot be cured, except by putting a person into an institution where he cannot get the drug; that that course is absolutely necessary. "Drug addicts themselves will tell you that, as long as they are out where they can get the drug, walking around, why, they will get it." His testimony was that in institutions heroin is never given, and that in cases where the gradual withdrawal method is pursued a patient is given as a rule one or two grains of morphine for a day, and

that the drug is gradually withdrawn in the course of a week or ten days, until it is reduced to nothing. Then before he is permitted to leave the institution he is kept confined for six weeks or two months, and given treatment to build up his general health. There are other methods, such as the rapid withdrawal method and the sudden withdrawal method. He testified that all the various methods of treating drug addiction involved taking the patient off the drug. A hypothetical question was put to the witness, justified by the evidence in the case and he was asked whether in his opinion the method pursued by the physician could be regarded as "a method of promoting the cure of a drug addict." And he replied that it could not.

[4] This brings us to the second assigned error. It is claimed that defendant was prejudiced by the refusal of the court to permit defendant's counsel to ascertain whether or not any of the jurors had preconceived ideas as to the treatment of drug addicts. It appears that, while the jury was being impaneled and in the course of the examination of talesmen, the government objected to a certain course of examination, and the court sustained the objection and said:

"I am not going to have methods of treatment discussed here to any elaborate extent. They can be asked the question whether they would be so prejudiced in regard to any idea they have about treatment, if you want to, that would influence their impartial judgment of the case, or whether they will try the case according to the evidence and the law given by the court."

Again, counsel for defendants asked a juryman whether he had formed any idea, while serving on the grand jury, as to what a doctor should do, to which counsel for the government objected, and the objection was sustained. Counsel for defendant desired to ask the juror whether, as a result of hearing grand jury cases, he had any notions as to what a doctor should do, and the court stated that such question was improper. Again, a juror was asked what a doctor should do in his practice of treating an addict, to which objection was made and the objection sustained.

These rulings cannot be held error. By the great weight of authority a juror is not disqualified, even if he has an opinion, if he states that it will not affect his verdict, and the court is satisfied of the truth of his statement. Jones v. State, 181 Ala. 63, 61 South. 434; Forte v. People, 57 Colo. 450, 140 Pac. 789; Commonwealth v. Minney, 216 Pa. 149, 65 Atl. 31, 116 Am. St. Rep. 763; State v. Hoyt, 47 Conn. 518, 36 Am. Rep. 89; People v. McGonegal, 136 N. Y. 62. 32 N. E. 616; State v. Salgado, 38 Nev. 64, 145 Pac. 919, 150 Pac. 764; State v. Owen, 126 La. 646, 52 South. 860; Whitehead v. State, 97 Miss. 537, 52 South. 259; State v. Banner, 149 N. C. 519, 63 S. E. 84; Palmer v. State, 121 Tenn. 465, 118 S. W. 1022; Russell v. State, 53 Tex. Cr. R. 500, 111 S. W. 658; Hall v. Commonwealth, 89 Va. 171, 15 S. E. 517; State v. Hudson, 110 Iowa, 663, 80 N. W. 232.

It is said that the rule established at an early day in England was that no opinion previously formed or expressed by a juror as to the merits of a case was sufficient to disqualify him, unless it proceeded from actual favor or ill will towards one of the parties, or was of

such a nature as to furnish of itself a presumption of such favor or ill will. People v. Mather, 4 Wend. (N. Y.) 229, 21 Am. Dec. 122; 16 R. C. L. p. 263. Mr. Chief Justice Marshall, in Burr's Trial (1 Burr's Trial, 416), stated the rule to be that—

"light impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror, but that those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him."

In Reynolds v. United States, 98 U. S. 145, 25 L. Ed. 244, a petit juror in a criminal case testified on his voire dire that he had formed an opinion as to the guilt or innocence of the accused, but that he did not think that it would influence his verdict. He was challenged for cause by the prisoner and the challenge was not allowed by the trial court. The Supreme Court, in an opinion written by Chief Justice Waite, held that this action of the trial court was not erroneous, but that if the juror had formed a positive and decided opinion he would have been incompetent. If a juror's state of mind is such that he can weigh the testimony and render a verdict without bias or prejudice of any kind, he is competent. Partan v. United States (C. C. A.) 261 Fed. 515, 517.

In the case now before us the record shows that the court gave every opportunity to question the talesmen as to whether they had any ideas which would prevent them from deciding the case according to the evidence. In Hopt v. Utah, 120 U. S. 430, 7 Sup. Ct. 614, 30 L. Ed. 708, the talesman stated on his voire dire that he had impressions as to the guilt or innocence of the person accused, and that they were possibly strong enough to create some bias or prejudice, but that he thought he could be guided by the evidence and try the case impartially. The court below held the juror competent, and the Supreme Court held that the judgment of the trial court as to the juror's competency was conclusive. And see Holt v. United States, 218 U. S. 245, 248, 31 Sup. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138; Spies v. Illinois, 123 U. S. 131, 168, 8 Sup. Ct. 21, 22, 31 L. Ed. 80.

[5] In this connection it may be said that, even if in the above rulings an error had been made, and we are convinced that none was committed, the defendant would not be entitled to complain of it, inasmuch as at the time the jury was impaneled he had exercised only 5 of the 10 peremptory challenges to which he was entitled. Hopt v. Utah, supra; Stroud v. United States, 251 U. S. 15, 21, 40 Sup. Ct. 50, 64 L. Ed. 103.

[6] The next assignment of error is based upon the refusal of the court to strike out the whole of the testimony of three drug wholesalers, called as witnesses by the government, and who had testified as to the amount of drugs purchased from time to time by the defendant. The testimony was introduced primarily for the purpose of sustaining certain counts in the second indictment, which charged the defendant with having purchased large quantities of the drugs for a purpose other than the use or distribution by him in the legitimate practice of

his profession as a physician. At the close of the government's case that indictment was dismissed. The defendant's counsel then moved that all evidence based on that indictment covering purchases from wholesale druggists should be stricken out. The motion was properly denied. It is said that, inasmuch as all charges for purchasing drugs had been dismissed, all evidence of purchases should have been stricken out. While the evidence was originally introduced to support the counts of the indictment that was dismissed, we think it was also material in support of the counts in the remaining indictments upon which the verdict was rendered. Those counts involved the question whether the defendant was practicing his profession in good faith in an attempt to cure the addicts to whom defendant dispensed the drugs, or whether he was engaged in handling the prohibited drugs as merchandise. In determining that question the jury was entitled to have before it information as to the quantity of the drugs purchased. In his instructions to the jury the court made it plain that the mere amount of drugs purchased was only to be considered upon the issue of good faith in an attempt to cure. "It merely has a bearing upon what he was doing," the court charged, "and presents an argument for your consideration which the government has outlined, as to what time he had, in view of the quantities of people he treated, to give them a conscientious examination." There was no exception to this instruction; and if the refusal of the motion to strike out was error it was cured by a correct instruction to the jury concerning the purpose for which they might consider it. Pennsylvania Co. v. Roy, 102 U. S. 457, 459, 26 L. Ed. 141.

[7] This brings us to the last error relied upon. It is argued that the court committed an error in not permitting counsel for defendant to bring out facts and the law in relation to the registration under the New York state law of certain of the addicts named in the indictment, and as to the possession by those addicts of state registration cards permitting them to obtain certain quantities of narcotics. It is said that defendant should have been permitted to show that he dispensed the drugs only to persons holding such cards. We do not see that it was at all material whether the addicts had or had not complied with the state law, or whether the defendant had refused to treat any addicts who had not obtained such cards. The defendant was not being tried for any offense against the New York state law, but for the violation of a federal act.

The defendant had a fair trial, and was in our opinion properly convicted of the criminal acts with which he was charged.

Judgment affirmed.